IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

CONNOR JUDGE,                              )        CASE NO. 1:17-CV-2330
                                           )
                    Plaintiff,             )
                                           )
            v.                             )
                                           )        MAGISTRATE JUDGE
                                           )        KATHLEEN B. BURKE
COMMISSIONER OF SOCIAL                     )
SECURITY ADMINISTRATION,                   )
                                           )        **MEMORANDUM OPINION & ORDER**
                    Defendant.             )

        Plaintiff Connor Judge ("Judge") seeks judicial review of the final decision of Defendant

Commissioner of Social Security ("Commissioner") denying his application for Disability

Insurance Benefits ("DIB").  Doc. 1.  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).

This case is before the undersigned Magistrate Judge pursuant to the consent of the parties.  Doc.

13.

        For the reasons set forth below, the Commissioner's decision is **AFFIRMED**.

## I. Procedural History

        Judge filed his application for DIB in September 2014, alleging a disability onset date of

August 24, 2014.  Tr. 15, 144.  He alleged disability based on neuromyelitis optica and

transverse myelitis.  Tr. 163.  After denials by the state agency initially (Tr. 86) and on

reconsideration (Tr. 87), Judge requested an administrative hearing (Tr. 108).  A hearing was

held before Administrative Law Judge ("ALJ") Peter Beekman on November 4, 2016.  Tr. 32-56.

In his April 5, 2017, decision (Tr. 15-26), the ALJ determined that there are jobs that exist in

significant numbers in the national economy that Judge can perform, i.e. he is not disabled.  Tr.

24.  Judge requested review of the ALJ's decision by the Appeals Council (Tr. 143) and, on

October 4, 2017, the Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  Tr. 1-3.

## II. Evidence

### A. Personal and Vocational Evidence

Judge was born in 1992 and was 22 years old on the date his application was filed.  Tr. 159.  He has a high school education and previously performed work as a cashier, a babysitter and a landscaper.  Tr. 35-36.

### B. Relevant Medical Evidence

On August 31, 2014, Judge was admitted to Fairview Hospital with bilateral lower extremity paresis, sensory loss, and visual changes.  Tr. 669, 2222.  His symptoms started gradually seven weeks earlier when he lifted his girlfriend and heard a "pop" in his back.  Tr. 2222.  He was unable to walk and kept falling.  Tr. 669.  He was diagnosed with neuromyelitis optica (NMO)[1] and transverse myelitis.  Tr. 340, 671.  He received intravenous steroids and plasmapheresis.  Tr. 340.  MRIs showed cord signal abnormalities throughout the thoracic central cord, subtle cortical abnormalities of the brain, and midline disc protrusion resulting in mild central canal stenosis at L5-S1.  Tr. 600, 1106.  By September 1, Judge continued to weaken and the attending doctor believed it was probably neuromyelitis optica spectrum disorder.  Tr. 689.  He was transferred to Cleveland Clinic on September 2 and remained through September 12, 2014.  He was feeling better and began to taper off his intravenous steroids and plasmapheresis.  Tr. 637.  He participated in physical and occupational therapy.  Tr. 1334.  He was transferred to MetroHealth Hospital on September 12 and remained through September 19.  Tr. 1334.  He was

---

[1]  NMO is inflammation of the optic nerve and spinal cord that causes vision problems, including blindness; flaccid paralysis of the extremities; and sensory and genitourinary disturbances.  *See* Dorland's Illustrated Medical Dictionary, 32nd Edition, 2012, at 1267.

discharged, then readmitted on September 20 for lower abdominal pain, fever, tachycardia, nausea, and vomiting. Tr. 1552. He had a kidney stone and a urinary tract infection. Tr. 1565, 1567.

On October 14, 2014, Judge was admitted to MetroHealth due to pain in his right eye, blurry vision and sensitivity to light. Tr. 332. He was assessed with optic neuritis of the right eye and, based on his prior response to IV steroid treatment and plasmapheresis, this course of treatment was prescribed again. Tr. 341. On October 17, Judge was transferred to MetroHealth's physical medicine and rehabilitation department for inpatient treatment. Tr. 298. An MRI of his cervical spine showed abnormal intensity and slight expansion of the thoracic spinal cord at T3 and T4 and a thoracic MRI was recommended. Tr. 301. He was scheduled for physical and occupational therapy, speech-language pathology, rehabilitation nursing 24 hours a day, social work and case management, rehabilitation psychology, and recreational therapy. Tr. 302. He ambulated using a quad cane or a wheeled walker. Tr. 310, 2413. He tolerated therapy well, demonstrated increased independence in dressing, bathing and functional transfers, and was discharged home on October 22, 2014, with no further occupational therapy needed. Tr. 325. At discharge, his pain was controlled with medications as needed and he was fully weight-bearing. Tr. 2224.

On November 25, 2014, Judge followed up with neurologist Mary Rensel, M.D. Tr. 857, 1200. His principal diagnosis was multiple sclerosis. Tr. 1200. He denied any new symptoms, said he was "feeling great," he was walking independently, and he reported occasional back pain. Tr. 1200. He was taking oral steroids. Tr. 858. He was interesting in participating in an NMO study. Tr. 1201.

On December 17, 2014, Judge went to the emergency room at a Cleveland Clinic hospital complaining of depression. Tr. 849. He had not been able to sleep lately due to chronic lower back pain and he had frequent crying spells. Tr. 849. Upon exam, he was not tearful or depressed, stating that he felt better in the presence of his mother and being evaluated at the hospital, and he had a stable gait and no neurological deficits. Tr. 851. He was discharged with instructions to follow up with a psychologist or psychiatrist, did not receive a diagnosis, and was given a prescription for Ativan. Tr. 851.

On December 19, 2014, Judge saw Matthew Sacco, Ph.D., for a psychological evaluation upon referral from Dr. Rensel. Tr. 239. Judge stated that his most bothersome symptom was his anxiety. Tr. 240. His sleep was impaired due to pain, nocturia, spasms and worry. Tr. 241. Upon exam, he was oriented, pleasant and cooperative, adequately groomed, had normal speech and thought process, and his affect was consistent with his reported depressed mood. Tr. 242. Dr. Sacco diagnosed adjustment disorder with mixed anxiety and depression and a substance induced mood disorder from prednisone. Tr. 242. He recommended Judge continue stress management and consult with Dr. Rensel for a trial of antidepressants. Tr. 243.

Judge saw Dr. Sacco for a follow up visit on December 29. Tr. 246. Judge reported that he had not started his antidepressants, his mood has stabilized since his last appointment, and he agreed that his mood would likely benefit from psychotropic medication. Tr. 246. Dr. Sacco remarked that Judge had very poor internal coping strategies for emotional unrest and has largely relied upon illegally obtained prescription drugs, marijuana, cocaine, and cigarettes. Tr. 247. Dr. Sacco prescribed Lexapro and recommended bi-weekly therapy. Tr. 247.

On January 6, 2015, Judge saw Dr. Renzel for a follow up visit. Tr. 252. He was walking his dog a few times per day and he was feeling better overall. Tr. 252. His Ativan was

helping him sleep and his back pain was better; it only occurred with "a lot of activity." Tr. 252. Upon exam, he had 5/5 strength in all upper and lower extremity muscles, he had mild left arm and leg spasticity, normal coordination, diminished perception to pinprick and vibration, impaired standing balance bilaterally, and a normal, independent gait. Tr. 254. He was on prednisone, Lyrica for pain, and Ativan and Lexapro for anxiety and was wearing depends due to his neurogenic bladder. Tr. 255. He was tolerating his medication and these were continued; he was also to begin a controlled medication study in February for neuromyelitis optica and neuromyelitis optica spectrum disorders involving infusions. Tr. 255, 277-278.

On January 14, 2015, MRIs of Judge's cervical spine and brain were normal. Tr. 1177. An MRI of his thoracic spine showed improvement in areas of hyperintensity compared to October 2014. Tr. 1778.

On February 9, 2015, Judge saw Michael Harrington, M.D., for a pain management consultation. Tr. 2439. He complained of random pain in his back that shot into his left leg and increased spasm in his upper thighs. Tr. 2439. Lyrica and Percocet helped. Tr. 2439. On exam, Dr. Harrington recorded some mild lower mid-back pain, abnormal reflexes, and intact sensation. Tr. 2440. He remarked that Judge had done well with Lyrica; he increased his Lyrica, refilled his Percocet, added meloxicam, and urged him not to use THC. Tr. 2441. He diagnosed transverse myelitis, paraplegia, neuromyelitis optica, low back pain, lumbar radiculopathy, and lumbar myelopathy. Tr. 2441.

On February 19, 2015, Judge saw Dr. Rensel and denied symptoms indicating an NMO relapse. Tr. 281. On April 14, he told Dr. Harrington he was more active and played basketball a few times per week. Tr. 2436. He said meloxicam helped some with his back pain. Tr. 2436.

On April 30, Judge saw Dr. Rensel for worsening vision and soreness in his right eye. Tr. 2582, 2587. She ordered three days of solumedrol infusion therapy. Tr. 2587. A brain MRI showed new diffuse enhancement throughout the right intraorbital optic nerve extending into the right canalicular segment, suspicious of demyelination. Tr. 2648.

On May 7, Judge reported to Dr. Rensel that his right eye pain had resolved and the vision in his right eye was slightly improved. Tr. 2608. May 18, Judge saw opthamologist Lisa D. Lystad, M.D., and his visual acuity had improved to 20/20-1. Tr. 2611

On June 21, 2015, Judge went to the emergency room at Fairview Hospital due to leg numbness and pain and was admitted. Tr. 2512, 2536, 2667. He was given a solumedrol infusion and was noted to be ambulatory with a slow but steady gait. Tr. 2514. Judge reported that he had begun tapering some of his medications, including Lyrica, on his own about one week before the hospitalization. Tr. 2536.

On June 30, 2015, Judge saw Dr. Sacco for the third time, after "multiple and repeated no shows." Tr. 2540. Judge confirmed that he had been illegally obtaining Xanax and hydromorphone. Tr. 2540. He had stopped smoking marijuana every day. Tr. 2540. Dr. Sacco counseled Judge on substance abuse treatment programs but Judge was adamant that he could "beat this myself." Tr. 2540. He also stated that he had taken his father's "stronger dose of Viagra" but that it did not help his reduced libido; Dr. Sacco warned Judge about taking other people's medications "but he obviously does not understand." Tr. 2540. Dr. Sacco noted that Judge had broken up with his girlfriend, started misusing his medications and improperly obtaining others, and has a misplaced confidence in his ability to manage his problems. Tr. 2540. He recommended the Cleveland Clinic's chronic pain and rehabilitation program and alcohol and drug rehabilitation program. Tr. 2541.

On July 1, 2015, a brain MRI showed a white matter lesion consistent with Judge's history of neuromyelitis optica. Tr. 2551.

On August 18, Judge reported to Dr. Rensel that he had stopped almost all of his medications and had mild improvement. Tr. 2727. He denied symptoms indicating an NMO relapse. Tr. 2727. He drove that day and was "doing ok." Tr. 2727. He had been swimming in his father's pool and Dr. Rensel observed insect bites from Judge having gone out boating. Tr. 2727. He denied depression and was planning on attending community college. Tr. 2727. He reported problems sleeping and Dr. Rensel recommended a sleep evaluation. Tr. 2727.

Judge had a sleep evaluation at the Cleveland Clinic on August 26, 2015. Tr. 2730. At the end of the evaluation, Silva Neme Mercante, M.D., suggested Doxepin would be a good option, whereupon Judge reported that MetroHealth pain management had started him on Nortriptyline, which Dr. Mercante increased. Tr. 2733. Judge requested benzodiazepine and Ambien, but Dr. Mercante recommended Judge speak to his psychiatrist about benzodiazepine and would not prescribe Ambien due to Judge's reports of abnormal behaviors when taking it. Tr. 2733.

On October 8, 2015, Judge reported right eye pain and blurriness to Dr. Rensel. Tr. 2742. By November 10, his eye issues were resolved. Tr. 2748, 2753.

On November 11, 2015, Judge had an initial assessment with Kevin Nasky, D.O., at Psychological Behavioral Consultants. Tr. 2691. He had normal mental exam findings and was diagnosed with panic disorder and anxiety disorder and was prescribed Ambien and Ativan. Tr. 2692-2693.

On January 2, 2016, Judge went to the emergency room at the Cleveland Clinic complaining of bilateral leg pain so severe that he could not walk. Tr. 2799. He did not have

symptoms of paralysis. Tr. 2799. Attending physician Michael Glasenapp, M.D., observed that Judge had good strength with no evidence of paralysis and unremarkable laboratory results. Tr. 2802. He referred Judge for a neurological evaluation, Tr. 2802, whereupon MaryAnn Mays, M.D., recorded full strength throughout except slightly diminished strength in the left hip, diminished sensation, intact coordination, and a wide gait. Tr. 2806. Dr. Mays opined, "suspect 'exacerbation' is related to the fact that he received 90 Percocet on 12/28 and now he has none." Tr. 2810. Judge stated that he had given some to his father and that his ex-girlfriend stole the rest. Tr. 2810. His family said they were concerned about his opioid use and his mother warned the hospital of his "very manipulative behavior." Tr. 2810. Dr. Mays did not prescribe additional opioids. Tr. 2810.

Three days later, Judge went to the emergency room at MetroHealth for bilateral leg pain and numbness. Tr. 2838-2840. Attending physician Joseph Tagliaferro, D.O., noted that he had been discharged from the Clinic the day before with "negative MRIs." Tr. 2838. Judge was "crawling around the room" and initially refused an MRI because the doctor would not give him opiates. Tr. 2838. An eventual MRI showed no acute findings and Judge was seen using both legs. Tr. 2838. Judge's history of leaving the hospital against medical advice and pain medication-seeking behaviors were noted. Tr. 2839. His mother and fiancée had called prior to his arrival expressing concern about his narcotic-seeking behavior, and his father expressed a similar concern at the hospital. Tr. 2840. On examination, Matthew Roehrs, D.O., observed that Judge had greatly diminished hip flexion strength until he was informed he would not receive IV narcotics, at which point he "quickly and effortlessly rolled in bed flexing legs to reach[] for phone. Tr. 2840. Dr. Roehrs offered Judge a non-narcotic analgesic. Tr. 2840.

On January 19, 2016, Judge had a physical therapy evaluation at the Cleveland Clinic and a treatment plan was established to decrease his back and leg pain. Tr. 2861. On February 2, Judge was discharged because he had not been compliant with his home exercises and had not returned for therapy. Tr. 2869.

On April 18, 2016, Judge saw Dr. Harrington and told him that Lyrica and meloxicam helped and the doctor wrote that he was "having some luck" with gabapentin. Tr. 2821-2822. Upon exam, he had some mild lower mid-back pain and intact sensation. Tr. 2822.

On April 28, Judge saw Dr. Nasky, "in crisis," stating that he was unable to sleep and was tearful and anxious due to fighting with his girlfriend. Tr. 2680. Judge reported that his investigational drug trial therapy for his NMO "kept him stable" and he denied any medication side effects. Tr. 2680. Upon exam, he was attentive, calm, cooperative, friendly, and oriented, with normal speech, an appropriate affect and congruent mood, a normal thought process, no memory problems, and good insight and judgment. Tr. 2680-2681. Dr. Nasky diagnosed panic disorder, anxiety disorder and major depressive disorder, recurrent, moderate, and modified his medications. Tr. 2681.

On May 12, 2016, Judge saw Dr. Rensel and told her that his symptoms were stable; he walked his dog and tried to stay active. Tr. 2771. On May 18, he saw Dr. Lystad and had trace afferent pupillary defect of the right eye and mild optic atrophy of both eyes. Tr. 2766.

On June 21, 2016, Judge saw Cleveland Clinic urologist Daniel Shoskes, M.D., for erectile dysfunction. Tr. 2777. He reported severe bladder issues with incontinence and he wore two to three diapers a day. Tr. 2777.

In an email to Kutaiba Tabbaa, M.D., of MetroHealth on July 21, 2016, Judge declined the recommended baclofen pump and spinal cord stimulator for his low back pain, writing that Percocet and Lyrica were "doing an OK job." Tr. 2818-1219.

On October 6, 2016, Judge saw Maria Neri Nixon, M.D., at the Cleveland Clinic for an emergency room follow up visit. Tr. 2885. He had leg cramping, muscle weakness and back pain, 9/10. Tr. 2885. Upon exam, he was pleasant and restless, alert, oriented, in no acute distress; he had no back pain upon palpation, intact sensation, and negative bilateral straight leg raises. Tr. 2887-2888. He was diagnosed with leg cramps due to chronic illness, neuropathy, NMO, and anxiety. Tr. 2888.

On December 8, Judge saw Dr. Harrington for a follow up visit. Tr. 2929. Dr. Harrington explained that he had recommended that Judge see a doctor closer to home due to his difficulties complying with appointments, "etc." Tr. 2930. Upon exam, Judge had some mild lower mid back pain and intact sensation. Tr. 2931. Dr. Harrington continued his medications and added others to assist with the transfer of Judge's care to a new provider. Tr. 2931.

### C. Medical Opinion Evidence

#### 1. Treating Source

On August 4, 2016, Dr. Rensel completed a medical source statement on behalf of Judge. Tr. 2695-2696. She indicated that Judge had no lifting or carrying limitations but that his impairments affected his ability to stand, walk, or sit; she did not complete the sections of the form asking for the number of hours he could perform those activities. Tr. 2695. Regarding his ability to perform postural activities, she wrote "would need fce [functional capacity evaluation]." Tr. 2695. She opined that Judge could frequently reach, push/pull, and perform fine and gross manipulation; had a restriction with respect to exposure to temperature extremes

(but not heights, moving machinery, pulmonary irritants, or noise); had been prescribed a cane and walker; needed to alternate positions at will between sitting, standing, and walking; and had moderate to severe pain that interfered with his concentration, took him off task, and caused absenteeism. Tr. 2695-2696. Dr. Rensel did not complete the portions of the form calling for "medical findings in support of this assessment." Tr. 2695-2696.

## 2. Consultative Examiner

On February 12, 2015, Judge saw Tomas Evans, Ph.D., for a psychological consultative examination. Tr. 291. Dr. Evans opined that Judge would have no limitations carrying out simple to moderately complex instructions, he displayed good attention and concentration throughout the entire evaluation and was able to maintain focus without difficulty; he reported no problems getting along with others; and he had no psychiatric disorders that would prohibit employment. Tr. 293, 295.

## 3. State Agency Reviewers

On January 5, 2015, state agency reviewer Leslie Green, M.D., reviewed Judge's record. Tr. 81-83. Regarding Judge's physical residual functional capacity (RFC), Dr. Green opined that Judge could lift 20 pounds occasionally and 10 pounds frequently, stand or walk for 2 hours and sit for about 6 hours in an 8-hour workday, occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl, could never climb ladders, ropes, or scaffolds, and should avoid concentrated exposure to extreme cold and vibration and all exposure to hazards, including unprotected heights. Tr. 82-83. On August 5, 2015, Maria Congbalay, M.D., reviewed Judge's record and adopted Dr. Green's opinion. Tr. 66-68.

## D. Testimonial Evidence

### 1. Judge's Testimony

Judge was represented by counsel and testified at the administrative hearing. Tr. 34. Judge described the onset of his NMO in August 2014: he experienced a lot of leg pain for two days and could not sleep, and then he woke up paralyzed from his navel down. Tr. 37. His paralysis lasted for a month and then it slowly began to subside. Tr. 37. He was diagnosed with neuromyelitis optic and transverse myelitis. Tr. 37. He has neuropathic pain, spasticity from his feet to the middle of his back that causes pain and discomfort, and bladder and bowel issues. Tr. 37. He also has a lot of fatigue since the onset of his disease. Tr. 37. When he was in the hospital he would take naps all the time and when he arrived home from rehab he had no energy. Tr. 37. He would wake up, let his dog out, and sit on the couch and end up falling asleep again. Tr. 38.

On an average day during the relevant disability period—August 27, 2014, through June 30, 2016—Judge would get up and immediately let his dog out and feed him. Tr. 39. Then he would usually go to the couch because he would be tired. Tr. 39. If he had energy and his legs were feeling alright and he didn't have too much stabbing pain, he would try to walk his dog as much as possible. Tr. 39. That would drain him a lot. Tr. 39. His dog is a 100 pound Doberman; his dog used to be pretty crazy so, when he got home from being paralyzed, his grandmother paid to get him trained and "he is amazing now." Tr. 50. He also attempts to clean but he can't do laundry anymore because he will fall down the stairs with the laundry basket. Tr. 49. He would also try to go to the "Y" and ride a bike to make his legs feel better. Tr. 39. Sometimes that would help, but a lot of days he would just sit around in pain and sleep, and it was very depressing. Tr. 39. He would take a lot of naps, at least a 2-hour nap three to five times per week. Tr. 39. For his pain, he takes Lyrica and recently started tramadol in place of Percocet; for spasticity he takes Soma. Tr. 39. When he is taking his medications, his pain, on

average, is a 5/10.  Tr. 49.  About half the days in a month he does not leave home due to pain, fatigue and depression.  Tr. 49.

For enjoyment, Judge spends time with his girlfriend.  Tr. 40.  They try to go out, but she works "and then I have my days like all the time."  Tr. 40.  When they don't go out they watch movies and television and Judge is able to follow the plot.  Tr. 40.  He is able to drive.  Tr. 40. He confirmed that his paralysis was temporary and that, at the hearing, he used no assistive device.  Tr. 37.  He has fallen at times.  Tr. 42.  In April 2015, he fell off a stoop of a house while trying to work delivering pamphlets because his feet were numb.  Tr. 45.

With respect to his bowel and bladder issues, Judge has a lot of frequency and urgency problems and he has bladder accidents at least three times a day.  Tr. 40-41. He wears diapers but they are not the best; they leak through his pants and he has to change his pants at least once a day.  Tr. 41.  He was attending his sister's graduation recently and had a bowel accident.  Tr. 41. This happens to him a couple of times a month.  Tr. 41.  He also wets the bed and has to wake up at least 3-5 times a night to avoid doing so.  Tr. 41.  He sets his alarm for every two hours during the night to wake up to use the restroom.  Tr. 47.  After he does, it takes 10 minutes to an hour to return to sleep, and sometimes he does not go back to sleep.  Tr. 47.  He is seeing a urologist for his bladder issues and the doctor wants to do a procedure involving a catheter, but Judge is not totally comfortable with that yet.  Tr. 41.  For his bowel issues, there is nothing they can do; they just tell him to eat as healthy as possible.  Tr. 41.

Judge also has temporary and transitory blindness when he has an optic neuritis attack; he goes to the hospital and they give him methyl prednisone and his vision comes back.  Tr. 41. Since his onset attack, Judge has had three optic neuritis attacks.  Tr. 42.  When asked about his non-compliance with physical therapy, Judge stated that he has a bulging disc in his back that

was not NMO-related and explained that he did not have the energy to do the physical therapy. Tr. 43.  When asked about a hospital note from January 2016 indicating that Judge had severe pain that made him unable to walk but that he did not have paralysis, Judge explained that it was painful to walk but that he was able to.  Tr. 43.  He was asked about a treatment note that stated that he changed a tire for his sister and Judge stated that he tries his best to help his family even if he has to fight through the pain.  Tr. 43.  He confirmed that he had told an emergency room provider in January 2016 that he would kill himself after he had been denied narcotics.  Tr. 44. When asked how many times between January and June 2016 Judge experienced pain that severe, he stated probably about three to five times.  Tr. 44.  Each time, he went to the emergency room.  Tr. 44.  He explained that his pain scares him because it is similar to the pain he had when he was paralyzed from the onset of his disease.  Tr. 44.

When asked if he was seeing a mental health specialist, Judge responded that he had just seen a psychologist for the first time about a week prior to the hearing.  Tr. 44.  He and this provider were "really clicking" and he stated that he had not had a relationship like this with other psychiatrists and psychologists.  Tr. 44.  He has anxiety also but it is getting better because he has leaned to deal with what he has.  Tr. 51.  He stated that he had been thinking about going to community college but did not; he did not have the drive to do it at the time and he feels it would be a waste of money because he would either miss days due to his fatigue or he would be distracted by his pain.  Tr. 46.

Judge explained that the clinical trial he is in for his NMO is a drug that aims to stop relapsing; it does not help to repair the body.  Tr. 48.  More recent MRIs have shown improvement in his spinal lesions, but that does not mean that the myelin damaged from those lesions will heal.  Tr. 48.  For that, there is nothing to make it better.  Tr. 48.  He has problems

standing for 15-20 minutes and he has no issues sitting; he likes to stretch because he is so spastic and constantly moving his legs. Tr. 52. The longest he can sit without stretching is an hour. Tr. 52. He always has the sensation of pins and needles in his legs and feet and this makes it more painful to take a step. Tr. 52.

### 2. Vocational Expert's Testimony

Vocational Expert ("VE") Kathleen Reis testified at the hearing. Tr. 52-55. The ALJ discussed with the VE Judge's past relevant work. Tr. 53. The ALJ asked the VE to determine whether a hypothetical individual with Judge's age, education and work experience could perform his past relevant work or any other work if the individual had the following characteristics: can lift and carry 20 pounds occasionally and 10 pounds frequently; can stand and walk 2 hours in an 8-hour workday and can sit more than 6 hours in an 8-hour workday; can occasionally use ramps or stairs but not ladders, ropes or scaffolds; can occasionally balance, stoop, kneel, crouch and crawl; must avoid high concentrations of cold and vibration and must entirely avoid dangerous machinery and protected heights; and must have immediate access to restroom facilities, i.e., a restroom within the same building as the work area. Tr. 53-54. The VE answered that such an individual could not perform Judge's past work but could perform work as a cashier (187,000 national jobs, 6,800 Ohio jobs); order clerk (60,500 national jobs, 900 Ohio jobs); and charge account clerk (45,000 national jobs, 700 Ohio jobs). Tr. 54-55.

Judge's attorney asked the VE whether an individual who would miss two or more days a month or be off task 20% of the workday could perform work and the VE answered that such an individual could not. Tr. 55.

### III. Standard for Disability

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability. "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy . . . .

42 U.S.C. § 423(d)(2).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations. The five steps can be summarized as follows:

1. If claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920;[2] *see also Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987).

Under this sequential analysis, the claimant has the burden of proof at Steps One through Four.

*Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the

Commissioner at Step Five to establish whether the claimant has the vocational factors to

perform work available in the national economy. *Id.*

## IV. The ALJ's Decision

In his April 5, 2017, decision, the ALJ made the following findings:

1. The claimant last met the insured status requirements of the Social Security Act on June 30, 2016. Tr. 17.

2. The claimant did not engage in substantial gainful activity during the period from his alleged onset date of August 27, 2014 through his date last insured on June 30, 2016. Tr. 17.

3. Through the date last insured, the claimant has the following severe impairments: neuromyelitis optica and other diseases of the spinal cord. Tr. 17.

4. Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1. Tr. 20.

5. Through the date last insured, the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he could stand or walk two hours per eight-hour workday and sit more than six hours per workday. He could occasionally use a ramp or stairs, but never ladders, ropes, or scaffolds. He could occasionally balance, stoop, kneel, crouch, and crawl. The claimant needed to avoid high concentrations of cold and vibration, and avoid all exposure to dangerous machinery and unprotected heights. He required immediate, nearby access to restroom facilities, meaning within the same building. Tr. 20.

6. The claimant cannot perform his past relevant work. Tr. 24.

7. The claimant was born in 1992 and was 22 years old, which is defined as a younger individual age 18-49, on the date last insured. Tr. 24.

---

[2] The DIB and SSI regulations cited herein are generally identical. Accordingly, for convenience, further citations to the DIB and SSI regulations regarding disability determinations will be made to the DIB regulations found at 20 C.F.R. § 404.1501 *et seq.* The analogous SSI regulations are found at 20 C.F.R. § 416.901 *et seq.*, corresponding to the last two digits of the DIB cite (i.e., 20 C.F.R. § 404.1520 corresponds to 20 C.F.R. § 416.920).

8. The claimant has at least a high school education and is able to communicate in English. Tr. 24.

9. Transferability of job skills is not an issue because the claimant does not have past relevant work. Tr. 24.

10. Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed. Tr. 24.

11. The claimant was not under a disability, as defined in the Social Security Act, at any time from August 27, 2014, the alleged onset date, through June 30, 2016, the date last insured. Tr. 25.

## V. Plaintiff's Arguments

Judge challenges the ALJ's decision on two grounds: the ALJ failed to follow the treating physician rule and his RFC assessment was inadequate in that it failed to account for all of Judge's limitations. Doc. 16, p. 1.

## VI. Legal Standard

A reviewing court must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record. 42 U.S.C. § 405(g); *Wright v. Massanari*, 321 F.3d 611, 614 (6th Cir. 2003). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992) (quoting *Brainard v. Sec'y of Health & Human Servs.,* 889 F.2d 679, 681 (6th Cir. 1989) (per curiam) (citations omitted)). A court "may not try the case *de novo*, nor resolve conflicts in evidence, nor decide questions of credibility." *Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

## VII. Analysis

**A. The ALJ did not err with respect to the opinion of Judge's treating physician**

Under the treating physician rule, "[a]n ALJ must give the opinion of a treating source controlling weight if he finds the opinion well supported by medically acceptable clinical and laboratory diagnostic techniques and not inconsistent with the other substantial evidence in the case record." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(c)(2). If an ALJ decides to give a treating source's opinion less than controlling weight, she must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544. In deciding the weight given, the ALJ must consider factors such as the length, nature, and extent of the treatment relationship; specialization of the physician; the supportability of the opinion; and the consistency of the opinion with the record as a whole. *See* 20 C.F.R. § 416.927(a)-(d); *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 747 (6th Cir. 2007).

Judge argues that the ALJ erred because he failed to provide controlling weight, or give "good reasons" for assigning little weight, to the opinion of his treating neurologist, Dr. Rensel. Doc. 16, pp. 12, 14. The ALJ considered Dr. Rensel's opinion:

> Dr. Rensel submitted a medical source statement indicating the claimant's ability to lift or carry was unaffected by his NMO, but he would be affected by temperature extremes, was prescribed assistive devices, would need to alternate positions, and his pain would interfere with his ability to concentrate (Exhibit 18F). Dr. Rensel did not provide objective reasoning to support her opinion, which generally was inconsistent with the evidence of record. As discussed above, the claimant maintained intact cognitive functioning, including attention and concentration. While he used assistive devices during his initial hospitalization, his record did not indicate that subsequently they were necessary, as he maintained a generally normal gait and engaged in activities, such as walking his dog. Because Dr. Rensel did not provide objective support for her opinion and the claimant's record indicated greater functioning, I give her limited weight.

Tr. 24. Previously in his decision, the ALJ identified Dr. Rensel as Judge's treating neurologist. Tr. 21. He detailed the record evidence showing that, when Judge started treating with Dr. Rensel, his MRI results showed improvement in his thoracic spine, physical exam findings showed good functioning (5/5 bilateral shoulder shrug, normal right upper and lower extremity muscle tone; mild left upper and lower extremity spasticity; normal strength throughout; and intact coordination), and he had some diminished sensation and mild unsteadiness but a normal gait without using an assistive device. Tr. 21. The ALJ remarked that Dr. Rensel treated Judge with an investigative trial therapy, including periodic injections, and that Judge denied NMO-related symptoms when he began his treatment. Tr. 21-22. The ALJ continued to detail Judge's history, explaining that he then began treating with Dr. Harrington in pain management (normal to mild physical exam findings), medication helped Judge's pain (to the extent that he was playing basketball a few time per week), and that Judge complained of increased foot numbness to Dr. Rensel but he ambulated at baseline and his eye symptoms occurring in May 2015 improved within a few weeks. Tr. 22. The ALJ commented on Judge's exacerbation of NMO in June 2015 and that Judge had admitted he had begun tapering off his medications without medical advice. Tr. 22. Objective medical evidence showed Judge was stable and, upon stopping his medication in August 2015, he continued to be stable with no significant symptoms. Tr. 22. He continued with his trial therapy, reported mild symptoms that did not limit his activities significantly (although he stopped playing basketball due to fatigue), and his only remaining issue was incontinence, for which he wore diapers. Tr. 22. The ALJ stated that, in January 2016, Judge was admitted to the Cleveland Clinic for another NMO exacerbation, but that physical exam findings showed no evidence of paralysis, he had good strength, diminished sensation and normal coordination, and that he left against medical advice when the attending

physician would not give him the pain medication he requested because the physician noted that he had a recent refill of Percocet that Judge stated he had given away or had been stolen and that Judge's family reported concerns to the hospital about opioid use and Judge's manipulative behavior. Tr. 22-23. Judge exhibited the same narcotic-seeking behavior shortly thereafter at a different emergency department and his family reported the same concerns. Tr. 23. The ALJ remarked that Judge had been discharged from physical therapy for non-compliance after attending only 2 sessions; he responded well to his prescribed medication; he rejected more aggressive treatment; physical exam findings were normal or mild; and he had continued to treat with Dr. Rensel, who reported that Judge's symptoms were stable and that Judge stayed active and walked his dog regularly. Tr. 23. The ALJ summed up the above: Judge's physical exam findings were normal or mild, his exacerbations of NMO coincided with treatment non-compliance and questionable behavior and motives; and, outside exacerbation episodes, Judge did not require in-patient treatment and had a relatively active lifestyle (exercise, basketball, swimming, long walks, taking classes). Tr. 23.

Judge argues that the ALJ "simply dismiss[ed] the doctor's opinion due to the absence of objective reasoning and support" and that this "short-cut analysis" does not comply with the regulations. Doc. 16, p. 14. The Court disagrees. The ALJ found that Dr. Rensel's opinion was not supported by objective evidence and was inconsistent with the record evidence (Tr. 24), which is a proper basis for assigning less than controlling weight to a treating source opinion. *Wilson*, 378 F.3d at 544 (6th Cir. 2004) (the ALJ must give a treating source's opinion controlling weight if he finds it to be well supported by objective evidence and not inconsistent with the record); 20 C.F.R. § 404.1527(c)(3) ("The more a medical source presents relevant evidence to support a medical opinion, particularly medical signs and laboratory findings, the

more weight we will give that medical opinion. The better an explanation a source provides for a medical opinion, the more weight we will give that medical opinion."). Judge does not dispute that Dr. Rensel did not assess postural limitations (stating that Judge needed a functional capacity exam), declined to state how Judge was limited (i.e., how long he could sit, stand or walk), and did not provide any reasoning for any of her findings.

Judge asserts that the ALJ's assessment is "perfunctory" and does not constitute "good reasons." Doc. 16, p. 14. Again, the Court disagrees. The ALJ discussed the length, nature, and extent of the treatment relationship Judge had with Dr. Resnel and identified her as Judge's treating neurologist. Tr. 21. *See* 20 C.F.R. § 404.1527 (the ALJ considers the length, nature, and extent of the treatment relationship and specialization of the physician). The ALJ commented that Dr. Rensel did not offer any support for her opinion and her opinion was inconsistent with the record as a whole. *Id.* (the ALJ considers the supportability of the opinion and the consistency of the opinion with the record as a whole). And elsewhere in his decision the ALJ detailed Judge's history of his NMO, including repeated visits to Dr. Rensel, and summed up that evidence as showing that Judge had improved when medication compliant. In short, the ALJ gave good reasons that are sufficiently specific to make clear to any subsequent reviewer the weight he gave to Dr. Rensel's opinion and the reasons for that weight. *Wilson*, 378 F.3d at 544.

**B. The ALJ's RFC is supported by substantial evidence**

Judge argues that the ALJ's RFC assessment failed to account for Judge's following limitations: a sit/stand option, pain, mental restrictions, and bathroom difficulties. Doc. 16, pp. 15-20. First, he asserts that the ALJ "did not consider the real world nature of Plaintiff's relapsing/remitting symptoms associated with [NMO]." Doc. 16, p. 15. But the ALJ considered them and discussed them; he accurately remarked that, with the exception of Judge's eye

symptoms that resolved after a few weeks of treatment in May 2015, Judge's symptom exacerbations coincided with treatment noncompliance and questionable behavior and motives (narcotic-seeking and manipulative behavior). Tr. 23.

Next, Judge argues that the ALJ's RFC focused on his exertional limitations and failed to take into account his "nonexertional and intermittent restrictions." Doc. 16, p. 16. He does not identify his alleged "nonexertional and intermittent restrictions" that the ALJ is alleged to have not considered. To the extent he is referring to Dr. Rensel's opinion (that Judge needs a sit/stand option), the ALJ adequately explained why he gave little weight to Dr. Rensel's opinion, as explained above. Additionally, Dr. Rensel did not assess any postural limitations or environmental restrictions other than temperature extremes; based on Judge's back pain and diminished sensory functioning, the ALJ limited Judge to no more than 2 hours on his feet per workday, occasional postural activities, avoiding all hazards, and no climbing dangerous apparatuses, i.e., more limited than Dr. Rensel had opined. Tr. 20, 23. As for Judge's assertion that he had mental restrictions, the ALJ did not find his mental impairments to be severe at Step Two (Tr. 17), a finding that Judge does not challenge.

With respect to Judge's statements of pain, the ALJ explained that he did not find his statements entirely credible. Tr. 24. As detailed above, the ALJ commented on the mostly normal or mild objective findings following Judge's NMO onset in August 2014 and his subsequent rehabilitation in October 2014. *See Walters*, 127 F.3d at 531 (the ALJ considers objective medical evidence when assessing credibility). The ALJ observed that Judge had not been compliant with treatment, improved when he was, and had episodes of provider-observed narcotic-seeking and manipulative behavior. *See Biestek v. Comm'r of Soc. Sec.*, 880 F. 3d 778, 789 (6th Cir. 2017) (an ALJ properly considers compliance with treatment as well as

"problematic usage patterns" with respect to medication). And the ALJ correctly considered Judge's activities. *Id*. Finally, despite Judge's assertion to the contrary, the ALJ did consider Judge's bathroom difficulties; he limited Judge to performing work that had immediate and nearby access to restroom facilities. Tr. 20, 24.

Substantial evidence supports the ALJ's decision and, therefore, it must be affirmed. *See Jones v. Comm'r of Soc. Sec*., 336 F.3d 469, 477 (6th Cir. 2003) (the Commissioner's decision is upheld so long as substantial evidence supports the ALJ's conclusion).

## VIII. Conclusion

For the reasons set forth herein, the Commissioner's decision is **AFFIRMED.**


IT IS SO ORDERED.



Dated: September 4, 2018

*/s/ Kathleen B. Burke*
_____
Kathleen B. Burke
United States Magistrate Judge